Case 4:22-cv-00344   Document 15   Filed on 12/27/22 in TXSD   Page 1 of 8

United States District Court
Southern District of Texas
**ENTERED**
December 27, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| KATHERINE YVETTE BELL, § § Plaintiff. § § V. § § KILOLO KIJAKAZI, *Acting Commissioner*, *Social Security Administration*, § § § § § § Defendant. § | CIVIL ACTION NO. 4:22-cv-00344 |

## OPINION AND ORDER

Plaintiff Katherine Yvette Bell ("Bell") seeks judicial review of an administrative decision denying her applications for disability insurance benefits and supplemental security income under Titles II and Title XVI of the Social Security Act (the "Act"). *See* Dkt. 1. Before me are competing motions for summary judgment filed by Bell and Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner"). *See* Dkts. 12, 14. Having reviewed the briefing, the record, and the applicable law, Bell's motion for summary judgment is **DENIED**, and the Commissioner's motion for summary judgment is **GRANTED**.

## BACKGROUND

On June 16, 2020, Bell filed applications for Title XVI supplemental security income and Title II disability insurance benefits, alleging disability beginning on June 4, 2020. Her applications were denied and denied again upon reconsideration. Subsequently, an Administrative Law Judge ("ALJ") held a hearing and found that Bell was not disabled. Bell filed an appeal with the Appeals Council. The Appeals Council denied review, making the ALJ's decision final and ripe for judicial review.

## APPLICABLE LAW

The standard of judicial review for disability appeals is provided in 42 U.S.C. § 405(g). *See Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). Courts reviewing the Commissioner's denial of social security disability applications limit their analysis to (1) whether the Commissioner applied the proper legal standards, and (2) whether the Commissioner's factual findings are supported by substantial evidence. *See Est. of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). Addressing the evidentiary standard, the Fifth Circuit has explained:

> Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance. It is the role of the Commissioner, and not the courts, to resolve conflicts in the evidence. As a result, [a] court cannot reweigh the evidence, but may only scrutinize the record to determine whether it contains substantial evidence to support the Commissioner's decision. A finding of no substantial evidence is warranted only where there is a conspicuous absence of credible choices or no contrary medical evidence.

*Ramirez v. Colvin*, 606 F. App'x 775, 777 (5th Cir. 2015) (cleaned up). Judicial review is limited to the reasons relied on as stated in the ALJ's decision, and *post hoc* rationalizations are not to be considered. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Under the Act, "a claimant is disabled only if she is incapable of engaging in *any* substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (cleaned up). The ALJ uses a five-step approach to determine if a claimant is disabled, including:

> (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.

*Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017)).

The burden of proof lies with the claimant during the first four steps before shifting to the Commissioner at Step 5. *See id.* Between Steps 3 and 4, the ALJ considers the claimant's residual functional capacity ("RFC"), which serves as an indicator of the claimant's capabilities given the physical and mental limitations detailed in the administrative record. *See Kneeland*, 850 F.3d at 754. The RFC also helps the ALJ "determine whether the claimant is able to do her past work or other available work." *Id.*

## THE ALJ'S DECISION

The ALJ found at Step 1 that Bell had not engaged in substantial gainful activity since June 4, 2020. *See* Dkt. 6-4 at 10.

The ALJ found at Step 2 that Bell suffered from "the following severe impairments: HIV, asymptomatic; cervical cancer; degenerative joint disease of the right knee; degenerative disc disease of the lumbar spine; urinary incontinence; obesity; depression; and anxiety." *Id.* at 10–11.

At Step 3, the ALJ found that none of these impairments met any of the Social Security Administration's listed impairments. *See id.* at 11.

Prior to consideration of Step 4, the ALJ determined Bell's RFC as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can stand and/or walk 2 hours in an eight hour workday and sit for 6 hours in an eight hour workday. She should never climb ladders, ropes, or scaffolds. She is limited to occasional in all other posturals. She should have occasional use of foot controls with the right lower extremity. She is limited to frequent handling and fingering bilaterally. She requires bathroom access. She should avoid any unprotected heights/dangers such as sharp objects, unguarded machines or commercial driving, and would tolerate only occasional exposure to extreme cold and uneven terrain. She is limited to simple, repetitive tasks with occasional contact with supervisors, coworkers, and the public. She should work in a low stress not fast[-]pace environment.

*Id.* at 16.

At Step 4, the ALJ found that Bell is unable to perform any past relevant work. *See id.* at 24.

At Step 5, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant can perform," and therefore found that Bell is not disabled. *See id.* at 25.

## DISCUSSION

This social security appeal raises only one issue: whether the ALJ's RFC is supported by substantial evidence and free of legal error. I find that it is.

Although Bell suffers from a number of severe impairments, the only impairment at issue here is Bell's urinary incontinence. At the hearing before the ALJ, Bell testified that she wears diapers at nights and "padding throughout the day"; that she urinates "[f]our to five times every hour"; that this frequent urination has "continued from 2018 through the present"; and that she changes her pads "[p]robably ten times a day." Dkt. 6-6 at 40. Bell contends that the RFC does not properly accommodate the specific limitations that she testified result from her urinary incontinence, is unsupported by substantial evidence, and is legally erroneous.

First, Bell takes issue with the ALJ's interpretation of the testimony of Dr. Kwali Amusa ("Dr. Amusa"), the medical expert who testified at Bell's hearing. The ALJ summarized Dr. Amusa's testimony on the urinary incontinence issue as follows:

> [Dr. Amusa] noted that the claimant's urge incontinence was significantly improved with medication. She indicated that the claimant would have to be on task for 90% of the workday and not miss more than one workday per month. She denied that the evidence supports that the claimant requires additional bathroom breaks during the relevant time period.

Dkt. 6-4 at 21. Bell argues "that the ALJ err[ed] in finding that Dr. Amusa testified that the evidence of record does not support a finding that [Bell] requires additional bathroom breaks during the relevant time period." Dkt. 12 at 7. At issue is Dr. Amusa's testimony that Bell "may require an additional bathroom break."

4

Dkt. 6-6 at 53. Bell contends that the ALJ's RFC is contrary to this testimony. Read in context, however, it is clear that the RFC is consistent with Dr. Amusa's testimony:

> [Dr. Amusa] So, certainly the Claimant may require an additional bathroom break just based on the evidence that I have before me, Judge.
>
> [ALJ] Well, see, the issue on that is going to be, you know, her being away from her workstation and also her exceeding the time on task and time and attendance requirements. And the time on task is going to be 90 percent and attendance is going to be she can't miss more than one day a month. **So, what I'm asking is, is do you see it exceeding those requirements based upon the records you have?**
>
> [Dr. Amusa] **Not based on the evidence.**

*Id.* (emphasis added). Considering the full exchange and placing Dr. Amusa's comment about needing an additional bathroom break in context, Dr. Amusa clearly testified that even if Bell does require an additional bathroom break, it should not keep her from being on task 90 percent of the time and missing no more than one day a month of work. This is entirely consistent with the ALJ's RFC.

Second, Bell argues that the ALJ impermissibly "picked and chose medical evidence favorable to his finding of a non-disability." Dkt. 12 at 8. At the administrative hearing, Dr. Amusa testified that Bell reported in February 2020 urge incontinence every hour, but that she significantly improved once she was prescribed Myrbetriq in May 2020. Bell criticizes the ALJ and Dr. Amusa for relying on a treatment note from June 29, 2020 that indicated improvement in Bell's urinary incontinence. The treatment note states, in relevant part:

> This is a 43 year old woman . . . presenting for ongoing management of urinary leakage.
>
> She reports urinary leakage with cough and sneeze as well as with urgency. She started ditropan 15mg ER last visit in February 2020. She has ben consistently taking & feels the benefit is minimal.
>
> During last clinic visit on 5/18/2020, patient was given Trial of [Myrbetriq] 50mg. Patient report significant symptoms response and would like to continue her medication. In addition, patient is working

> on behavior modification as well for night time symptoms. Kegel exercises for stress incontinence.

Dkt. 7-9 at 31–32. Although the word "improvement" does not appear in the treatment note, Dr. Amusa testified that "significant response to the medicine would mean improvement. That's the whole purpose for prescribing it is that is makes things better." Dkt. 6-6 at 58–59. Yet, according to Bell, "[a] complete medical history of [Bell's] urinary urge, frequency, pubic pain from September 29, 2017 (Tr. 981) through March 10, 2021 (Tr. 1323) does not indicate improvement." Dkt. 12 at 8. For the next five pages, Bell goes on to cite from her medical records in support of this argument. Four of those pages, however, discuss visits that precede the June 29, 2020 treatment note. *See id.* at 8–11. As Dr. Amusa observed during the hearing, the significant improvement noted in June 2020 "was after [Bell] was [e]ffectively treated. . . . [D]uring the relevant time period when she first saw the urologist, it's noted that she was not on medication for her urge incontinence that she said she was having every hour at that time. So, it was not being treated." Dkt. 6-6 at 54. Accordingly, medical records predating the June 29, 2020, and Bell's successful trial and continuation of a drug that effectively treated her urinary incontinence, have little relevance to Bell's argument that her medical history does not indicate improvement.

That said, Bell does cite to records that post-date the June 29, 2020 treatment note in support of her argument that her medical history does not show improvement of her urinary incontinence, but those records offer little substance. For example, Bell cites to a function report that she completed on July 6, 2020 that asked "Do the illnesses, injuries, or conditions affect your sleep?" Dkt. 12 at 11 (quoting Dkt. 6-12 at 25). She checked the "Yes" box and wrote, in relevant part, "Also frequent urination—take medication." Dkt. 6-12 at 25. Setting aside the questionable relevance that an answer regarding sleep has on one's ability to work, the mere statement that Bell has frequent urination for which she takes medication is not contrary to her having experienced a "significant symptoms response" to

6

Myrbetriq. Dkt. 7-9 at 32. Medication that treats urinary incontinence is just that—a treatment, not a cure. The 2020 and 2021 records to which Bell cites substantiate nothing more than the fact that Bell has urinary incontinence for which she takes medication. *See* Dkt. 12 at 12. None of them stand in direct contradiction to the June 29, 2020 treatment note regarding the improvement of her symptoms. Accordingly, I cannot say it was error for the ALJ to rely on Dr. Amusa's testimony that the June 29, 2020 treatment note indicated improvement in Bell's urinary incontinence such that she could remain on task 90 percent of the time and miss no more than one day of work a month. *See Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) ("A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.").

Finally, Bell argues that it was error for the ALJ to state in the RFC that she "requires bathroom access" without specifically accounting for the number of bathroom breaks she would need. I agree with Bell that "the need for bathroom access is not a limitation, it is the law." Dkt. 12 at 14. It was certainly clumsy for the ALJ to include in the RFC a "limitation" that is a legal right afforded to all employees. But the ALJ's inclusion of the phrase "requires bathroom access" does not mean that the RFC is unsupported by substantial evidence or the result of legal error. The ALJ specifically queried the medical expert whether the evidence supported Bell's inability to remain on task 90 percent and not miss more than one day a month of work, and the medical expert said that it did. More importantly, the ALJ thoroughly recounted all of the symptoms and limitations that Bell reported to him during the hearing. *See* Dkt. 6-4 at 18 (recounting Bell's testimony that she needs to urinate "four to five times an hour"; "that she wears pads daily and has to change her pads about ten times daily"; and "that she uses the bathroom fifteen to twenty times a day"). The ALJ found Bell's testimony "not to be entirely consistent regarding the severity of her symptoms and their effect on her ability to perform work related activities," and the ALJ found Bell's testimony "inconsistent with the written record." *Id*. Specifically, the ALJ found that Bell "is capable of living

7

independently" because "she is able to prepare simple meals, put dishes away, and put laundry away," in addition to shopping for herself, going out alone, and serving as "primary caretaker for her mother with dementia and cancer." *Id.* Moreover, "[a]lthough [Bell] alleged that she has a caretaker for herself," the ALJ found that "there is no evidence to support this contention." *Id.* Accordingly, the ALJ clearly considered all of the evidence before him, including Bell's testimony. It was for the ALJ to decide how to weigh that evidence. "A finding of no substantial evidence is warranted only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Ramirez*, 606 F. App'x at 777. That is not the case here.

## CONCLUSION

For the reasons provided above, Bell's motion for summary judgment (*see* Dkt. 12) is **DENIED**, and the Commissioner's motion for summary judgment (*see* Dkt. 14) is **GRANTED**.

SIGNED this 27th day of December 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE